# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 21-cr-20421-GAYLES(s)

**UNITED STATES OF AMERICA**

**vs.**

**JIANXIANG SHI**
       **a/k/a "Long Niu,"**

          **Defendant.**

_____/

## GOVERNMENT'S MOTION TO EXCLUDE PROPOSED DEFENSE EXPERT

The United States of America, through undersigned counsel, respectfully moves to exclude Defendant Jianxiang Shi's (the "Defendant") proposed expert witnesses, Dr. June Teufel Dreyer ("Dr. Dreyer"). The Government's objections are not merely ones of credibility best left for cross-examination, but instead arise from the irrelevance, lack of "fit" with the evidence, and needless delay, confusion, and unfair prejudice that would result from such testimony in this case. For these reasons, Dr. Dreyer's proposed testimony fails the test of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) (*en banc*). As criminal defendants do not have a "right to present expert testimony free from the legitimate demands of the adversarial system," the Court should exclude the Defendant's expert testimony in its entirety. *Frazier*, 387 F.3d at 1272 (quotation marks and citation omitted).

## I.    DR. DREYER'S PROPOSED TESTIMONY

On June 9, 2022, counsel for the Defendant provided the Government with a copy of Dr. Dreyer's *curriculum vitae* and provided notice that, given the Government's Motion *in Limine* seeking to introduce the testimony of a Red Notice issued against the Defendant, "we have decided to list a potential expert on China law enforcement abroad including Red Notices." Dr. Dreyer's

CV indicates that she has degrees in political science, East Asian studies, and government and far eastern languages and has been a professor of political science at the University of Miami from 1979 through the present (*see* **Exhibit A**, attached hereto). Her record also reflects that she has published books and articles on Chinese and Japanese political, military, and foreign affairs (*id.*).

On July 14, in response to the Government's written demand (*see* DE 51), counsel for the Defendant provided written notice of Dr. Dreyer's proposed testimony (*see* **Exhibit B**, attached hereto). In that disclosure, the Defendant laid out three general categories of proposed testimony that he intends to introduce through Dr. Dreyer: (1) testimony regarding Chinese tradition and law that ethnically Chinese people born in China are considered only to have Chinese nationality and no other, and that "it is an acceptable practice for Chinese people to alternatively use their mother's last name as their own last name, and to identify oneself based on the year of one's birth"; (2) testimony that the "Chinese government and Chinese Communist Party (CCP) are dictatorial, autocratic and non-democratic institutions," which often use violent means to target successful businessmen; and (3) testimony that "acquisition of dual or multiple citizenship [sic] and obtaining a foreign passport to escape from human right violations is a well known practice among Chinese entrepreneurs."[1]

---

[1] The Defendant's formal written disclosure made no mention of testimony concerning Red Notices, stating only that Dr. Dreyer will opine that Chine manipulates INTERPOL (Ex. B). If the Defendant still intends to elicit testimony regarding Red Notices from Dr. Dreyer, the Government objects to that as well on the ground that she is not qualified to opine on such subjects. Nothing in her writings, teachings, studies, or expertise as disclosed by the Defendant evinces any specialized or expert knowledge of Red Notices or INTERPOL. Further, since the Government simply seeks to introduce the fact of the Defendant's Red Notice as evidence of state of mind, knowledge, and intent, and not the underlying facts or truth of the criminal charges supporting it (*see* DE 38), it is difficult to see how expert testimony about Red Notices generally could be helpful to the jury.

## II.   LEGAL STANDARDS

A district court serves a critical role as the "gatekeeper" to the admission of expert testimony. *Daubert*, 509 U.S. at 589; *Frazier*, 387 F.3d at 1258. The gatekeeping obligation set forth in *Daubert* applies with equal force to all types of proposed expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). That obligation also applies fully to a criminal defendant's proposed expert testimony, however important to the defense that testimony supposedly may be. *See, e.g., United States v. Henderson*, 409 F.3d 1293, 1302–04 (11th Cir. 2005) (affirming exclusion of defendant's proposed expert testimony); *Frazier*, 387 F.3d at 1260, 1271–72 (emphasizing that a criminal defendant's constitutional and procedural rights do not entitle him to a lower standard for the presentation of expert opinion evidence and excluded a defendant's proposed expert); *United States v. Cunningham*, 194 F.3d 1186, 1196 (11th Cir. 1999) (same); *United States v. Gillard*, 133 F.3d 809, 814-16 (11th Cir. 1998) (same).

Once past that stage, the *en banc* Eleventh Circuit opinion in *Frazier*, a criminal case, lays out the requirements for admitting expert testimony. The district court's gatekeeping function "inherently require[s] the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under" Rule 702 of the Federal Rules of Evidence. 387 F.3d at 1260.

To determine whether expert evidence is admissible, trial courts must consider whether:

    (1)    the expert is qualified to testify competently regarding the matters she intends to address;

    (2)    the methodology by which the expert reaches her conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*;

(3)     the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue; and

(4)     the testimony passes the Fed. R. Evid. 403 balancing test, in that its probative value must not be substantially outweighed by its unfairly prejudicial effect.

*See id.* at 1260, 1263 (citing *Daubert*).

The proponent of the testimony, not the party challenging it, has the burden of establishing each of these requirements. *See id.* at 1260; *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1238 n.2 (11th Cir. 2005). And each of these requirements has significance.

The first prong of the analysis—whether the expert is qualified—ensures that the proposed expert's skills and education are not merely adequate generally, but actually relate to specific opinions he or she proposes to offer. "An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991). Thus, an expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge. *See, e.g., Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) ("When making a preliminary finding regarding an expert's qualifications under Fed. R. Evid. 104(a), the court is to examine not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question") (citations and internal quotation marks omitted).

The second prong of the analysis—the reliability of the proposed testimony—is meant to ensure that testimony from an expert, even if otherwise qualified, is sufficiently well-founded and

trustworthy to be presented to the jury. In ascertaining the reliability of a particular expert opinion, courts consider (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *See, e.g., McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (citing *Daubert*, 509 U.S. at 593–94). Where, as here, the proposed expert testimony is not of a technical nature, but rather falls within the ambit of social science, the court need not apply these factors mechanically, but nonetheless must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire*, 526 U.S. at 152. As the Eleventh Circuit has made clear, "testimony based solely on the experience of an expert [is] not [] admissible. The experts' conclusions must be based on sound scientific principles and the discipline itself must be a reliable one." *Rider v. Sandoz Pharmaceuticals*, 295 F.3d 1194, 1997 (11th Cir. 2002) (emphasis added). As the Court in *Frazier* emphasized, "the court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Frazier*, 387 F.3d at 1245 (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)).

The third prong of the analysis—whether the proposed testimony will help the jury—asks a different question: will the expert's opinion truly aid the jury in resolving the issues genuinely before it? Expert testimony, like all evidence, must be relevant. *See* Fed. R. Evid. 401, 402. Unlike ordinary testimony, however, expert testimony must do more; it must also "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As the Eleventh Circuit has explained, "more stringent standards of reliability and relevance…are necessary

because of the potential impact on the jury of expert testimony." *Allison v. McGhan Med. Co*., 184 F.3d 1300, 1309 (11th Cir. 1999). Courts therefore must "ensure that the proposed expert testimony is relevant to the task at hand [and] that it logically advances a material aspect of the proposing party's case." *Id.* at 1311 (internal quotation marks omitted) (citing *Daubert*).

The fourth and final prong of the analysis is a variation on Fed. R. Evid. 403. That rule allows a court to exclude evidence where its probative value is substantially outweighed by the risk that the evidence will confuse or mislead the jury or delay the trial by injecting collateral disputes. The rule applies to all evidence but applies with greater force to proposed expert testimony because of weight jurors may be inclined to give testimony given in the capacity of an expert. *See Allison*, 184 F.3d at 1309; *see also Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses") (citation and internal quotation marks omitted).

## III.   ARGUMENT

### A.   Proposed Defense Expert Dr. Dreyer Should Be Excluded

The Defendant's proposed expert testimony from a political science and East Asian studies professor is nothing more than a collection of irrelevant opinions that do not fit the evidence the Government will present during its case in chief. None of the proposed testimony offered by the Defendant is admissible. The Government takes each of the three categories of testimony noticed by the defense in turn.

1.     **Testimony About Chinese Traditions and Law Concerning Names and Nationalities**

The first category of proposed testimony regarding Chinese law and tradition's influence on Chinese individuals' views of nationality and proper names fails all four prongs of *Frazier*. *First*, according to her list of degrees, talks, and publications, Dr. Dreyer is an expert on Chinese political, military, and foreign affairs. There is no basis to suggest that she has specialized knowledge and expertise on Chinese citizenship laws, family practices, or the perception of Chinese nationals on the status of their names and nationalities. For that reason, although Dr. Dreyer may be qualified to testify about certain matters pertaining to China, she is not qualified to testify competently regarding others wholly outside her expertise. Chinese foreign affairs and government are not the same as a particular subset of distinct Chinese cultural practices. *See, e.g., United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (affirming in criminal case the exclusion of a proposed defense expert as unqualified); *Alexander v. Smith & Nephew PLC*, 98 F. Supp. 2d 1276, 1281 & n.1 (N.D. Okla. 2000) (emphasizing that simply because a proposed expert has training and experience in a broad field does not mean that she has sufficient specialized knowledge to qualify as an expert with respect to the narrower topics about which she seeks to testify).

*Second*, the reliability of this proposed testimony is by its very nature suspect. Presumably, the Defendant seeks to admit this testimony to somehow validate his own views of his nationality and "other names used" and thereby negate his fraudulent intent in making several false statements on the visa applications at issue in this case.[2]  How can Dr. Dreyer opine on what one individual

---

[2] For the reasons stated in the section below, for this reason, Dr. Dreyer's testimony could not possibly stand on its own. The only conceivable way this proposed testimony could perhaps pass muster under Fed. R. Evid. 401, setting aside the many other reasons such testimony is

may believe concerning his own particular family and cultural circumstances in applying *United States law* from an expert's generalized account about what *billions* of other individuals believe? Take for instance her proposed testimony that "[p]eople born in China to Chinese parents are regarded as having Chinese nationality for the rest of their lives." Ex. B. What kind of methodology could possibly be reliable enough to apply such a statement to all of China's people, let alone to the peculiar circumstances of this Defendant filling out several U.S. nonimmigrant visa applications? Separately, testimony regarding the content of Chinese law is an impermissible basis for expert testimony. The Court should be defining the law for the jury, not a defense expert. *See* Fed. R. Crim. P. 26.1.

*Third*, the Court should exclude this proposed testimony because it is wholly irrelevant to the issues in this case and thus cannot assist the jury in its task. At issue in this trial is whether the Defendant knew the following statements on his 2014 and 2016 visa applications were false when he traveled to the United States on those visas in November 2016: (1) that he had no other names besides "Jianxiang Shi"; (2) that he had no other nationalities besides China (according to his 2014 visa application) or both China and St. Kitts (according to his 2016 visa application); and (3) that he had no other passports besides his St. Kitts passport (according to his 2016 visa application). That Chinese tradition and current national law considers ethnically born Chinese people to only have Chinese nationality and considers the Defendant's mother's last name to be functionally part of his own is utterly irrelevant to answering these questions.[3]  The Government's case in chief will

---

inadmissible, is in backing the substantive claims regarding the Defendant's intent that could only come from the Defendant himself.

[3] And that latter fact is not the proper subject of expert testimony and can only come in through the Defendant's own testimony.

show that the Defendant created, knew about, and actively maintained an alternate identity with Marshall Islands citizenship and travel documents to preserve his ability to travel to the United States should his actual identity become an obstacle to doing so, as it did when China issued an INTERPOL Red Notice against him in January 2017. No interpretation of Chinese law and tradition can negate the clear import of this evidence regarding the Defendant's intent or provide an answer to the Defendant's state of mind in interpreting the clear meaning of *United States* immigration policy as articulated in the questions asked on its nonimmigrant visa application. *See United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1385-86 (11th Cir. 2011) (no abuse of discretion to exclude defense expert from testifying about matters irrelevant to what the jury must decide).

For precisely the same reasons, Judge Lenard excluded "the majority of Dreyer's…proposed testimony" under Fed. R. Evid. 702 in another criminal case. *See United States v. Merrill*, Case No. 08-cr-20574-LENARD (SD Fla.), DE 858 at 17 (*see* **Exhibit C**, attached hereto). In that case, Judge Lenard disallowed Dr. Dreyer from testifying about her interpretation of legal provisions related to Chinese military companies, whether particular ammunition was acquired from a Chinese military company, and the definition of a Chinese military company, subjects that are much more directly relevant to her areas of expertise. *Id*. at 17–19; *see also Merrill*, DE 902 (amended order) at 18–19 (see **Exhibit D**, attached hereto). The court found that Dr. Dreyer's testimony about ultimate facts at issue and the interpretation of law was improper and contradicted the court's own interpretation and orders. *Id*. The court also found that Dr. Dreyer's "proposed testimony regarding the Sino-Soviet conflict fails to assist the jury as

9

it is irrelevant." *Id.* at 20–21. This Court should hold the same and exclude Dr. Dreyer's proposed testimony about ultimate issues, legal principles, and irrelevant concepts.

*Fourth*, for much the same reasons as above, the proposed testimony has a high risk for prejudice by confusing the jury and the issues it must decide. Even if the Court were to conclude that this proposed testimony narrowly cleared the relevance hurdle under *Frazier* and Rule 401, the risk that the jury might misunderstand the meaning of such evidence is great and certainly outweighs its limited utility. To name a few potential sources of confusion, the jury might improperly conclude that Chinese law or tradition has any bearing on U.S. immigration law, that if the Defendant's alias corresponded to the year of his birth and his mother's name that he did not have any "other names used" beside "Jianxiang Shi," that the Defendant could not be a dual citizen and was only a citizen of China, or that Dr. Dreyer's testimony means that the Defendant could not have had fraudulent intent. None of these conclusions is correct as a matter of law and the facts the Government will establish in its case in chief. *See* Fed. R. Evid. 704(b) (prohibiting any expert from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or a defense").

Thus, for each of the above reasons, the Court should exclude this first category of proposed testimony.

### 2. Testimony About the "Dictatorial" and "Autocratic" Policies of the Chinese Government

Second, the Court should exclude any testimony from Dr. Dreyer regarding the antidemocratic and authoritarian policies of the current Chinese government, including that it engages in human rights abuses or targets "successful entrepreneurs," Ex. B, because those opinions are not helpful in assisting the jury decide the questions before it, and, indeed, is wholly

irrelevant in deciding whether the Defendant committed visa fraud. There is no exception to the prohibition against possessing and using a fraudulently obtained visa in 18 U.S.C. § 1546(a) for citizens of nondemocratic counties, and the fraudulent answers the Defendant gave on his 2014 and 2016 visa applications have nothing to do with the Government of China or its conduct. The Court should not allow the Defendant to launder an improper justification defense through expert testimony. Indeed, this entire subject amounts to little more than an invitation for jury nullification.

Even if such testimony were relevant, its potential for prejudice vastly outweighs any probative value the Defendant may claim it has. The only questions before the jury are what travel documents the Defendant possessed and used, when he possessed and used them, how he obtained them, and what he knew about the manner in which they were obtained. Expert testimony bashing the Chinese Communist Party has nothing to do with the U.S. immigration practices at issue here and seeks only to improperly inflame the passions of the jury.

**3.      Testimony Regarding the Common Practice of Chinese Businessmen Obtaining Dual Citizenship**

Third and finally, the Court should exclude the Defendant's proposed testimony that obtaining a foreign passport is a common practice for Chinese entrepreneurs to escape from human rights violations perpetrated by their government as irrelevant and overly prejudicial. If the purpose of such testimony is simply to assure the jury that the Defendant's possession of Chinese, St. Kitts, and Marshall Islands passports does not itself bespeak criminal activity, then the Defendant should not fear—the Government intends to introduce evidence of his dual nationalities only to show that the Defendant lied about their existence. Thus, expert testimony providing a justification for dual citizenship would not provide helpful context to the jury.

If, however, as appears to be the case, the Defendant seeks such testimony to imply that visa fraud is common and acceptable for persecuted Chinese entrepreneurs, then the Court should exclude it as irrelevant, prejudicial, and a fundamental misstatement of the law. There is no valid excuse or justification defense to visa fraud, and regardless, there is no evidence to support such a theory anyhow. Again, admitting expert testimony of this kind only seeks to invite jury nullification and waken the potential anti-Chinese government sentiments, legitimate or otherwise, of the jurors. Telling the jury that visa fraud under these circumstances is appropriate or justified is improper and fundamentally misstates the law.

In short, Dr. Dreyer's proposed opinions are irrelevant, do not correspond to the facts, will profoundly confuse the jury and contradict the law the jury must apply.

### B.     Separately, the Defendant's Expert Testimony is Admissible Only if the Defendant Testifies and Puts Certain Subjects in Issue

Dr. Dreyer's proposed testimony is inadmissible in full for all the reasons stated above. However, even if such testimony was reliable, helpful, and supported by Dr. Dreyer's qualifications, there would still be no basis to admit any of it without the Defendant's own testimony on each topic. Put it this way: if the Defendant does not testify that he is a successful businessman from China and persecuted by the Chinese Government, what basis would there be for admitting expert testimony on the practices of the government and businessmen of China? If the Defendant does not testify that his perceptions of his own nationality and the meaning of his alias are rooted in Chinese law and tradition, and that those laws and tradition controlled his state of mind at the time he filled out several U.S. visa applications, what basis would there be for generalized expert testimony on such cultural practices and attitudes?

Again, none of Dr. Dreyer's testimony is admissible regardless of whether the Defendant takes the stand. Still, independently of its failure to meet the requirements of *Daubert* and *Frazier*, such testimony lacks a basic foundation that only the Defendant can provide. Otherwise, the Court will grant the Defendant a gift the law does not allow—the benefit of putting on his defense case through an expert without subjecting the basic veracity of the facts underlying her opinions to cross examination.

IV.    **CONCLUSION**

For the reasons stated above, the Court should exclude the Defendant's proposed expert witness, Dr. June Dreyer, from testifying at trial.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY


By:    /s/ *Will J. Rosenzweig*
Will J. Rosenzweig
Assistant United States Attorney
Court ID No. A5502698
U.S. Attorney's Office - SDFL
99 N.E. 4th Street, Suite 600
Miami, FL 33132-2111
Telephone: (305) 961-9403
Email: will.rosenzweig@usdoj.gov